*In re Z.F. & B.F.*
No. 1609, Sept. Term 2024
Opinion by Leahy, J.

**Family Law > Children in Need of Assistance > Reasonable Efforts**

In Child in Need of Assistance ("CINA") cases, a department of social services is generally required under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, to make reasonable accommodations for parents with disabilities in rendering reunification efforts, as long as the parents make such disabilities, as well as the accommodations they require, known to the department.

**Family Law > Children in Need of Assistance > Reasonable Efforts**

Where a department of social services arranges mental health services or rehabilitation services through which necessary accommodations can be identified, it is the parent's obligation to participate in those programs and provide the department with all reports and assessments. *See* Maryland Code (1973, 2020 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP") § 3-802(a)(4).

**Family Law > Children in Need of Assistance > Reasonable Efforts**

The question whether reunification services reasonably accommodated a parent's disability is generally included within the question whether a department of social services met the CINA statute's "reasonable efforts" requirement. *See* CJP §§ 3-801(x), 3-816.1(b).

Circuit Court for Baltimore County
Case Nos. C-03-JV-22-000900; C-03-JV-22-000901

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1609

September Term, 2024

_____

IN RE: Z.F. & B.F.

_____

Berger,
Leahy,
Getty, Joseph M.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: July 1, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In this consolidated appeal from the Circuit Court for Baltimore County, sitting as a juvenile court, Ms. F. ("Mother")[1] challenges the court's decision to grant custody and guardianship of her two minor children—Z.F., born July 2012, and B.F., born April 2016 (collectively, the "Children")—to their maternal grandparents (the "Grandparents") and close their cases under the Child in Need of Assistance Statute, Maryland Code (1973, 2020 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), Title 3, Subtitle 8.[2]  A "child in need of assistance" ("CINA") is one who requires court intervention because the child has been abused or neglected, or has a developmental or mental disability, and the child's caretaker is either "unable or unwilling to give proper care and attention to the child and the child's needs."  CJP § 3-801(f).

Mother argues, among other things, that the court's finding that the Department of Social Services for Baltimore County (the "Department") made "reasonable efforts" to finalize the Children's concurrent permanency plans was clearly erroneous, as the Department failed to "reasonably accommodate" her autism under the Americans with Disabilities Act (the "ADA"), codified at 42 U.S.C. §§ 12101 – 12213.

---

[1] Although Mother testified that she changed her name in 2024, we refer to her as "Ms. F.," consistent with the circuit court's record and Mother's own brief on appeal.  We mean no disrespect thereby.

[2] The Children's father was a party in the underlying proceedings, but is not a party to this appeal.  He did not attend any hearings in the CINA cases below, except for a brief, unannounced appearance on July 23, 2024.

Mother presents one question for our review, which we have divided into two and rephrased for clarity as follows:[3]

I.      Was the juvenile court clearly erroneous in finding that the Department made reasonable efforts towards reunification?

II.     Did the juvenile court abuse its discretion in awarding the custody and guardianship of the Children to Grandparents and closing the CINA cases?

First, we conclude that the juvenile court was not clearly erroneous in finding that the Department made reasonable efforts toward Mother's reunification with the Children. We hold that the Department is generally required under the ADA to make reasonable accommodations for parents with disabilities in rendering reunification efforts in CINA cases, as long as the parents make such disabilities, as well as the accommodations they require, known to the Department. Parents of children who are declared CINA have an obligation to comply with their service agreements and court orders requiring them to sign release of information forms regarding necessary educational, medical, mental health, and substance abuse services and treatment. In this case, although Mother claimed that she was diagnosed with autism early in the CINA proceedings, she did not identify the extent of her disability or the accommodations she required, and generally failed to follow up with the health care service providers recommended by the Department. Despite the uncertainty regarding Mother's disability and her needs, the record establishes that the Department

---

[3] In her appellate brief, Mother presents the following single question:

1. Did the court commit error when it ended Ms. F's opportunity to reunify with her children and closed the CINA cases by granting custody and guardianship of the children to their grandparents?

made reasonable efforts to assist Mother in obtaining necessary services and scheduling visitation with the Children.

Second, we hold that the juvenile court did not abuse its discretion in awarding custody and guardianship of the Children to Grandparents, granting supervised visitation to Mother, and closing the CINA cases. Accordingly, we affirm.

## OVERVIEW OF CINA PROCEEDINGS

To provide context for our review of the extensive evidentiary record in the underlying cases, we begin with an outline of the statutory framework governing CINA cases.

Following the receipt of a complaint alleging child abuse or neglect, and after promptly investigating the allegations contained therein, *see, i.e.*, Maryland Code (1984, 2019 Repl. Vol.), Family Law Article ("FL") § 5-706, the Department "shall file" a petition in the juvenile court under the CINA statute if the "filing of [the] petition is in the best interests of the child[,]" CJP § 3-809(a).[4] Once the CINA petition is filed, the juvenile court "shall hold an adjudicatory hearing" for the purpose of "determin[ing] whether the allegations in the petition . . . are true." CJP §§ 3-801(c), 3-817(a). If the allegations are found to be true, the court must "hold a separate disposition hearing[,]" either "on the same

---

[4] Separately, the department may place the child in emergency shelter care. *See* CJP § 3-815(a); *see also* CJP § 3-801(bb) (defining shelter care as "a temporary placement of a child outside of the home at any time before disposition" of CINA petition). Once the child is placed in emergency shelter care, the department must file a petition for continued shelter care with the juvenile court by the next day that the court is in session. CJP § 3-815(c)(1); Md. Rule 11-204(b)(2). The shelter care offers "interim protection for a child pending further proceedings in the CINA case[.]" *In re O.P.*, 470 Md. 225, 267 (2020).

day as the adjudicatory hearing" or later, to determine whether the child is a CINA. CJP §§ 3-801(m), 3-819(a).

When a child is declared a CINA and removed from the home, "the local department of social services must develop a 'permanency plan' that is 'consistent with the best interests of the child[.]'" *In re M.Z.*, 490 Md. 140, 145 (2025) (citing CJP § 3-823(e)(1)(i)).[5] Reunification with a child's parents is the "[f]irst and foremost" permanency plan option.[6] *In re Blessen H.*, 392 Md. 684, 696 (2006); *see In re Yve S.*, 373

---

[5] When the court determines the child's permanency plan, it must "consider the factors specified in [FL] § 5-525(f)(1)[.]" CJP § 3-823(e)(2). Those factors are:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

FL § 5-525(f)(1).

[6] Consistent with this principle, the CINA statute provides the following hierarchy of placement options in "descending order of priority": (1) reunification with the parent; (2) placement with a relative for adoption or custody and guardianship; (3) adoption by a non-relative; (4) custody and guardianship by a non-relative; or (5) for a child at least 16 years old, another planned permanent living arrangement that addresses the individualized needs of the child and promotes continuity of relations with individuals who will play a "lasting and significant role in the child's life." CJP § 3-823(e)(1)(i).

Md. 551, 582 (2003) (noting that "it is presumed that it is in the best interest of a child to be returned to his or her natural parent"). However, "[i]n situations . . . where reunification may not be possible," the court may set a concurrent permanency plan and "tak[e] concrete steps to implement both primary and secondary permanency plans, for example, by providing time-limited family reunification services while also exploring relatives as resources." *In re Karl H.*, 394 Md. 402, 417, 418 n.3 (2006) (quoting Code of Maryland Regulations ("COMAR") 07.02.11.03(B)(16)). Indeed, the court "shall . . . [c]hange the permanency plan if a change . . . would be in the child's best interest[.]" CJP § 3-823(h)(2)(vii).

The juvenile court reviews the permanency plan at least every six months to determine, among other things, whether "reasonable efforts" have been made to finalize the permanency plan in effect for the child. CJP §§ 3-823(h)(1)(i), (h)(2)(ii). In doing so, the court must "assess the efforts made since the last adjudication of reasonable efforts and may not rely on findings from prior hearings." CJP § 3-816.1(b)(5). Since "there is no bright line rule to apply to the 'reasonable efforts' determination[,] each case must be decided based on its unique circumstances." *In re Shirley B.,* 191 Md. App. 678, 710-11 (2010), *aff'd*, 419 Md. 1 (2011). Additionally, as it is generally not in a child's best interest to remain without permanent placement for an extended time, "[e]very reasonable effort shall be made to effectuate a permanent placement for the child within 24 months after the date of initial placement." CJP § 3-823(h)(5); *see In re M.*, 251 Md. App. 86, 115 (2021); *see also In re Jayden G.*, 433 Md. 50, 83-84 (2013) (generally reviewing Maryland law recognizing children's need for permanency).

5

Where reunification is no longer the sole permanency plan for the subject minor child, the juvenile court may achieve the child's permanency plan by awarding "custody and guardianship to a relative or non[-]relative[.]" CJP §§ 3-819.2(b), (c). An order granting custody and guardianship to a non-parent also "[t]erminates the local department's legal obligations and responsibilities to the child" and, absent good cause, terminates the child's CINA case. CJP § 3-819.2(c). Before awarding custody and guardianship to a non-parent, the court must consider:

> (i)  Any assurance by the local department that it will provide funds for necessary support and maintenance for the child;
>
> (ii)  All factors necessary to determine the best interests of the child; and
>
> (iii)  A report by a local department or a licensed child placement agency, completed in compliance with regulations adopted by the Department of Human Services, on the suitability of the individual to be the guardian of the child.[7]

CJP § 3-819.2(f)(1); *In re M.*, 251 Md. App. at 116.

With this statutory framework in mind, we turn now to summarize the relevant facts.

**FACTUAL BACKGROUND**

During the time relevant to this appeal, Mother and Father were divorced, and Mother had primary physical custody of the Children. Grandmother (Mother's biological mother) lived with Grandfather (Mother's stepfather). By the time the Department became

---

[7] Such a report "shall include a: (i) Home study; (ii) Child protective services history; (iii) Criminal history records check; and (iv) Review of the proposed guardian's physical and mental health history." CJP § 3-819.2(f)(2). A court may not grant custody and guardianship to a non-parent until that report "is submitted to and considered by the court." CJP § 3-819.2(h).

6

involved in the family, Mother and the Children were living together with the Children's half-sister, L.R. (born October 2008).[8]

**EVENTS LEADING TO THE CINA ADJUDICATION**

*December 16–19, 2022 Emergency Shelter Placement*[9]

On December 16, 2022, Mother exhibited signs of paranoia, claiming that bombs were in her house and that there were tracking devices on her family's phones. Mother made the Children and L.R. "stand outside in freezing weather[.]" L.R. "ran away" and contacted Grandmother, who took her to the Greater Baltimore Medical Center ("GBMC"). A medical assessment at GBMC revealed that L.R. had sustained various assault injuries, including a busted lip and a swollen face and arm. The police took pictures of these injuries and "reported that [Mother] would be charged for the assault[,]" based on an existing protective order prohibiting her from harming L.R.

Meanwhile, Mother had called the police to report L.R. missing. When the police arrived, she told them that one of the Children, Z.F., was bleeding, but there was no sign of bleeding. Mother then took Z.F. to GBMC, where he was diagnosed with a common cold.

While at GBMC, a social worker came to discuss a safety plan with Mother, and based on her interactions with Mother, recommended that Mother be taken for a psychiatric

---

[8] L.R., a child from Mother's previous relationship, was not a party to the underlying CINA cases.

[9] The following facts are based on the factual allegations contained in the Department's amended CINA petition, filed on February 10, 2023, and sustained by the juvenile court.

evaluation. Mother was subsequently hospitalized at Sinai Hospital, and the Children were placed in emergency shelter care with Grandmother.

On December 19, 2022, the Department filed a CINA petition with a request for continued shelter care. Following a shelter care hearing that same day, the juvenile court granted the request, placing the Children in the Department's custody pending an adjudication hearing on the CINA petition. The court also granted temporary limited guardianship to both the Department and Grandmother. Mother was granted liberal and supervised visitation "as arranged by [the Department]."

On January 12, 2024, Mother was served with the arrest warrant for the alleged assault of L.R. and, following a bond review hearing that day, remained held without bond. After filing a petition for writ of habeas corpus, she was released under a no-contact order pending resolution of her criminal case.

*February 10, 2023 Adjudication and Disposition Hearing*

At the adjudication and disposition hearing on February 10, 2023, the parties agreed to present the court with an amended CINA petition, which contained the factual allegations summarized above. Without admitting or denying the allegations, Mother agreed to a CINA finding and to the commitment of the Children to the Department and their placement with Grandmother. Mother's counsel told the court:

> I would like to state that my client, [Mother], has acknowledged that she has had struggles with her mental health history and at the time that the case was sheltered, was having a mental crisis, an episode. **My client also acknowledges that she has -- is autistic, and at this time, many of her sensory levels were just overloaded.** She takes full responsibility and acknowledgement that she wants to be stable and back on track with doing what she needs to do to focus on her mental health and be -- continue to be a

8

fit parent for her children, including in this matter, B.F. and Z.F.

(Emphasis added).

At the conclusion of the hearing, the juvenile court declared the Children CINA, sustaining all factual allegations in the amended petition by a preponderance of the evidence, and found that "[u]ntreated mental health issues of the mother ma[d]e the home unsafe" for the Children. The court ordered that custody of the Children was with the Department, and granted both the Department and Grandmother a temporary limited guardianship. The court instructed that Mother would have "liberal and supervised" visitation as arranged by the Department. The court also ordered that Mother:

> (1) cooperate with the Department by providing family background information; signing Release of Information forms regarding educational, medical, mental health, and substance abuse services and treatment that are necessary to provide services to the child and family; (2) allowing scheduled and unscheduled home visits; (3) permitting access to the child, if applicable; (4) comply with service agreements; and maintaining consistent weekly contact with the Department; (5) [f]ollow through with recommendations from Sinai Hospital and enroll in psychiatric and counseling treatment, medication management and domestic violence counseling; (6) [e]nroll in and complete anger management and parenting classes.

With reunification as the sole permanency plan, the court set a review hearing for June 30, 2023, and a permanency planning hearing for December 1, 2023. Micaiah Baker was assigned as the Children's kinship care social worker.

**EVENTS LEADING TO CHANGE OF PERMANENCY GOAL**

*February 10, 2023 to June 30, 2023*

During the initial review period from February 10, 2023, through June 30, 2023, Mother completed court-ordered parenting and anger management classes. Although the

"no-contact" order related to her pending criminal case prohibited visits with the Children, Mother communicated with Grandmother to stay informed of the Children's wellbeing.[10] However, Mother did not sign a release of information form for Bloom Health, her mental health provider at the time, despite repeated requests from Ms. Baker. Mother also claimed to have started working for several different employers but provided no employment verification.

The Children faced some challenges with abiding by rules and structures at Grandmother's home and at school. Ms. Baker referred them to Kennedy Krieger Institute, where they started therapy in May 2023.

In advance of the June 30, 2023 hearing, the Department recommended that the permanency plan be reunification concurrent with custody and guardianship to a relative. Mother's counsel opposed, claiming that although Mother's autism had been "well-stated and well-known[,]" the Department did not offer "any ADA accommodations to further assist [her] . . . with getting forms or whatever else they need."[11] After hearing from the parties, the court continued the sole plan of reunification and found, without objection, that the Department made reasonable efforts to finalize the permanency plan.

---

[10] In addition, at the June 30, 2023 review hearing, the Children's counsel proffered that Mother "assist[ed] with cooking some meals for the [C]hildren during the week[ ] and also some of the laundry."

[11] Contrary to her counsel's representation, Mother's autism was only briefly mentioned once at the February 10, 2023 hearing and appears nowhere else in the record prior to the June 30, 2023 hearing.

*June 30, 2023 to December 1, 2023*

Throughout the next review period—from June 30, 2023 through December 1, 2023—Mother's employment and mental health treatment information remained elusive. In June, Mother identified Arts to Heal as her new mental health provider, but Arts to Heal had no active client under her name. Mother then told Ms. Baker that she was receiving mental health treatment from Kindred Treatment Center, but the number she provided was invalid. Subsequent communication with Kindred Treatment Center revealed that Mother was discharged after a single intake session due to multiple "no shows." Similarly, while claiming to work for a business named "Sweet Bluez,"[12] Mother provided no income or employment verification.

Mother's criminal case concluded in July 2023 with a one-year probation before judgment ("PBJ"), and her counsel confirmed in August that there was no court order prohibiting her contact with the Children. Despite this, Mother did not respond to Ms. Baker's attempts to arrange visitation. In September 2023, after multiple failed attempts to schedule visits, Ms. Baker notified Mother of a new plan requiring her to confirm availability by Sunday noon each week; however, Mother still had no in-person visits.[13] Aside from two brief virtual visits in August and "sporadic phone calls" that ceased by early October, Mother made almost no contact with the Children during this period.

---

[12] Although Ms. Baker's court report, dated November 13, 2023, lists the company as "Blue Sweetz," all other records list it as "Sweet Bluez."

[13] According to the Department, Mother's sole in-person contact with the Children during this period was a three-minute encounter in August 2023, at which time she "gave them a hug."

At Grandparents' home, the Children were "healthy and well cared for." They regularly attended medical appointments and worked with their individual therapists. Z.F. also showed "positive differences" both at home and school. Although the child still had challenges in understanding and completing his homework, Grandmother "consistently and diligently" worked with him after school. In August 2023, an Individualized Education Plan ("IEP") team meeting was convened for Z.F., attended by IEP chairperson, Grandmother, Z.F.'s teachers, his therapist, and Ms. Baker; Mother failed to show up.

Around late September 2023, Mother left her residence without informing Grandmother or the Department of her new address. In October, following her repeated failure to report to her probation agent, a bench warrant was issued, and her probation was extended to December 2024.[14] A Facilitated Family Meeting ("FFM") had been scheduled for late October to discuss Mother's progress and needs, but it was also cancelled the day before due to her unavailability. Grandmother later testified that Mother was "in California for six months and in Georgia for a couple [of] weeks" between late 2023 and early 2024. Mother acknowledged travelling to California and Georgia to seek help from family members, but she denied living outside of Maryland during that time.

*Change of Permanency Plan and Mother's Exception*

At the permanency plan review hearing on December 1, 2023, the Department again requested to change the permanency plan to reunification concurrent with custody and

---

[14] During the final permanency review hearing that is subject to this appeal, the juvenile court took judicial notice of Mother's violation of probation and extension of her probation.

12

guardianship to a relative. The Department's counsel proffered that Mother had "done very little, close to nothing, [during] this last review period[,]" highlighting the lack of any updates regarding her housing, mental health, and employment. Counsel also proffered that Mother had not responded to the Department's attempts to contact her regarding a new service plan, even though the previous plan had expired in August 2023. The Children's counsel joined the Department's request.

In opposing the change of the permanency plan, Mother's counsel argued that the Department failed to make reasonable efforts to achieve the original permanency plan—the sole plan of reunification. Counsel reiterated that Mother was "diagnosed with autism" and argued that "the Department should be making efforts to give her accommodations through ADA; however, . . . there have not been any ADA accommodations for [her]." Counsel also emphasized that the Department "ha[d] not sent her any employment resources[,]" suggesting that Mother might be "eligible for [Department of Rehabilitation Services ("DORS")], which is a program that would help people who have mental health illnesses, people with autism." Later during the hearing, however, Mother stated, "I work for Sweet Bluez. I do have a job[,]" and that she had informed the Department about her employment.[15]

At the end of the hearing, the magistrate recommended changing the permanency plan to reunification concurrent with custody and guardianship to a relative. He also found

---

[15] Mother's counsel stated that Mother's employment was "new news" to her, despite having spoken with Mother the day before, but acknowledged that counsel might have "heard her wrong."

13

that the Department made reasonable efforts to finalize the Children's permanency plan. Mother filed exceptions to the change of the permanency plan, challenging, among other things, the magistrate's finding of reasonable efforts, arguing, "there had been no accommodations provided for [Mother], who is [a]utistic, in accordance with the [ADA]."

At the exceptions hearing on March 11, 2024, however, Mother withdrew her exception regarding the Department's reasonable efforts.

> **I will withdraw the comment about lack of reasonable efforts because I am acknowledging that Ms. Baker, along with her office and my client, is trying to get the Department connected with that recent eval and I just hope that there can still be some type of additional services given to [Mother].** Some people with autism, some people with extreme mental health, some of the accommodations can simply be just more hours a week of visits or seeing the children more days a week. It's not something that we are asking that is extreme, like helping her fill out applications or something over the board, just something that is extra than how they would treat an average parent with no limitations. That is all, Your Honor. Thank you.

(Emphasis added). The following exchange then took place:

> THE COURT: [Department's Counsel], do you want to be heard any further or talk about the autism issue?
>
> [DEPARTMENT'S COUNSEL]: Just briefly. **It appears that the Department has made efforts on the autism issue. It also appears that [Mother's counsel] has withdrawn that as an exception (unintelligible).**
>
> THE COURT: Is that fair to say, [Mother's counsel]? Yes.
>
> **[MOTHER'S COUNSEL]: Your Honor, it's a yes at this time.**

(Emphasis added). The juvenile court denied Mother's exceptions and changed the permanency plan to reunification concurrent with custody and guardianship to a relative, but Mother did not appeal.

In January 2024, Mother's counsel emailed Ms. Baker, requesting "referrals for mental health providers who specialize in offering mental health services to adults with autism." Ms. Baker asked Mother to obtain an autism evaluation and provided her with a list of agencies that offer the evaluation. Mother responded that she had received the evaluation from the "Neuroscience Team." Ms. Baker asked her to sign release of information forms for the Neuroscience Team and Dr. Gabriel Newman, the physician who evaluated her, but Mother did not sign the form for months.

On March 6, 2024, after months of little contact with the Children, Mother requested in-person visits. Later that day, the visits were scheduled for Sundays from 4 to 5 p.m. at Towson Library, based on Mother's representation that she worked from 5:30 to 6:30 p.m. on Sundays. However, Mother informed Ms. Baker the next day that she could "no longer attend the Sunday visitation because she works at Towson Mall from 11am – 6pm[,]" and the visits were rescheduled to Mondays from 6 to 7 p.m. Grandmother became the primary supervisor for Mother's visits.

In April 2024, Mother signed her release of information for Dr. Newman, and then on May 14, after multiple attempts to contact Dr. Newman, Ms. Baker finally received his evaluation report. Unfortunately, however, the report only "ha[d] the diagnosis . . . of autism[,]" and did not provide enough information to "ensure the appropriate level of accommodations and intervention[.]" Ms. Baker recommended Mother "reach out to Kennedy Krieger and/or Sheppard Pratt" so that they could "connect her with providers

15

that offer mental health services [for] adults diagnosed with autism[,]" but Mother insisted on reaching out to the Autism Society instead.[16] The Department also contacted Dr. Newman for "the recommendations that were given to [Mother] upon discharge and further record of the details gathered during the autism evaluation[,]" but no such information was ever provided.

Mother's mental health treatment remained intermittent and unstable. On May 20, her counsel identified Anya Medspa and Behavioral Health Center as her mental health service providers. However, Mother's probation agent reported that she had been receiving mental health services from Chinyere Kalu since May 21. On June 4, Ms. Kalu informed Ms. Baker that Mother attended only one session and missed the follow-up. The very next day, Mother reported her appointment with a new therapist, Kaddie Kallon, who "specializes in the services she requires." Additionally, although Mother's probation agent referred her to Project Chesapeake, there was no record of her ever following up on this referral.

In June 2024, Mother informed Ms. Baker that she had left Sweet Bluez and was "only working online as a Brand Ambassador while she awaits to receive Social Security Disability." Ms. Baker sent her an employment resource, "HireUp." Ms. Baker also submitted referrals on behalf of Mother to various DORS locations and "sent [Mother] housing resources that the DORS website directed the Department to." Months later, at Mother's request, Ms. Baker resubmitted a DORS referral and informed her of the

---

[16] There is no record indicating whether Mother reached out to the Autism Society.

resubmission.[17]   Ms. Baker also assisted Mother with her developmental disability administration ("DDA") application.[18]   Mother initially missed the scheduled virtual meeting for the application, but Ms. Baker rescheduled the meeting, completed the application with Mother, mailed it, and followed up on its status the following month.

Later in June, Mother informed the Department that she was staying at a shelter named Karis Home.[19]   To accommodate Karis Home's 6 p.m. curfew, visits changed to Mondays 3 to 4 p.m. at the Hamilton branch of the Enoch Pratt Library.  Less than a month later, however, Karis Home asked Mother to leave after two warnings, citing "a number of instances that [she] inserted herself in arguments . . . without the desire to de-escalate." Mother's visitation schedule was then changed to Mondays from 6 to 7 p.m. at Towson Library.

After leaving Karis Home, Mother began "renting a room" at a psychiatric rehabilitation program named New Life Recovery Center, where she resided for the

---

[17] According to Mother, she had a "quick conversation" with a DORS employee, who informed her that she was "not in [its] service area[,]" and her referral needed to be resubmitted.  Despite Ms. Baker's follow-up inquiries, Mother was unable to identify the DORS employee or the specific DORS location to which the referral should be resubmitted.

[18] The DDA is a branch of Maryland's Department of Health. According to its website, the DDA "provides a coordinated service delivery system for people with developmental disabilities" and "partners with people with developmental disabilities and their families to provide leadership and resources to enable these individuals in living fulfilling lives." Developmental Disabilities Administration, https://health.maryland.gov/DDA/pages/home.aspx (last visited May 19, 2025).

[19] Although the Department's court report stated that Mother was placed at Karis Home via a DORS referral, Mother later testified that she found out about Karis Home through an email from Ms. Baker and was not placed by DORS.

remainder of the CINA proceedings. New Life Recovery Center assisted her with housing and employment and offered group mental health therapy sessions, which Mother attended "four times a week." Mother also began "actively participating in weekly therapy sessions" at HOME Therapeutic Services ("HOME"). HOME informed Ms. Baker that Mother was diagnosed with "Post traumatic stress disorder, acute F43.11" and recommended "at minimum . . . 6 months to 1 year" of services, with "no prescribed medication or discharge plans at this time."[20]

Despite some progress in housing and mental health treatment, Mother's visitations remained inconsistent. From March through July 2024, Mother attended six out of about twenty scheduled visits. Later in July, Ms. Baker told Mother that visits would stay at one hour per week so that the Department could monitor Mother's consistency, but Mother cancelled two additional visits in August and September. She also failed to attend any medical, educational, or therapeutic appointments for the Children. Although Ms. Baker provided contact information for the Children's mental health professionals, Mother did not reach out to them.

In or around August 2024, Ms. Baker sent Mother a new service plan to sign, but Mother refused, highlighting "things that needed to be corrected[.]" For one, Mother noted that the service plan listed Karis Home as her residence. Despite Ms. Baker's explanation that the Karis Home reference was just part of a "historical visitation plan"—indicating her prior residence—Mother insisted that she did not "want[ ] to sign a service plan that was

---

[20] Ms. Baker subsequently requested Mother's evaluation from HOME, but she did not receive it by the conclusion of the CINA proceedings.

outdated and had incorrect information[.]"  She also took issue with "wording on some of the actions within the service plan"—including the plan's requirement that she take "prescribed medication as recommended" despite not having prescribed medications at that time.[21]  Mother never signed the service plan.[22]

*Final Permanency Review Hearing*

The final permanency review hearing began on July 9, 2024, and ended on September 24, 2024.  Prior to this hearing, the Department submitted a home study report, dated April 19, 2024, which found that Grandparents "can sufficiently meet the financial needs of their household."  The home study highlighted Grandmother as "dedicated, caring, protective, loving, and a reliable caregiver[.]"  In addition, despite Grandfather's old criminal records, the home study found "no concerns" regarding the safety and wellbeing of the Children residing with him.  The home study report was admitted into evidence without objection.

The Department also submitted a court report, dated April 24, 2024, and multiple addendums, recommending that "the commitment of [the Children] be rescinded and

---

[21] During the final permanency review hearing, Mother testified that she was prescribed medications for her arthritis and slipped disc.  She also acknowledged having "a medical marijuana card" but denied using it.

[22] Around the same time, Mother informed Ms. Baker that the Children might be subject to the Indian Children Welfare Act ("ICWA"), indicating that she was a "Blackfoot-Cherokee Indian" through her father (Grandmother's ex-husband).  Ms. Baker spoke with her supervisor, Monique Swain, who also never had experience with ICWA.  Following the instructions from her superiors, Ms. Swain emailed the Cherokee Nation to notify them about the Children.  At the conclusion of the CINA proceedings, the juvenile court held that ICWA did not apply, finding no "sufficient credible evidence" for Mother's claim; Mother does not challenge this ruling.

19

custody and guardianship be awarded to [Grandmother]." In support of its recommendation, the court report stated that "[s]ince December 17, 2022, [Mother] has not made significant progress to alleviate barriers that brought her children into care" and that the Children "deserve the permanency and stability that [the grandparents] have and can continue to provide."

The juvenile court heard testimony from several witnesses who expanded on the facts summarized above. During her testimony, Ms. Baker reiterated that the evaluation report from Dr. Newman was insufficient to determine the "appropriate level of accommodations and interventions" for Mother. She stated that the evaluation report was mostly "contact notes of their sessions, . . . it just has the diagnosis on the paperwork of autism." When asked why she did not immediately refer Mother to DORS or DDA after receiving Dr. Newman's report, Ms. Baker testified that she did not know much about those programs and was unsure if Dr. Newman's diagnosis was sufficient for such a referral.

Ms. Baker identified Mother's inconsistent visits with the Children as the primary obstacle to reunification, explaining:

> [T]he ability to continue to maintain a bond and the parents integrating into the kids' life and ability to take on the responsibilities that the kids have. Such as for Z.F., he has an IEP and there's extensive back and forth when it comes to the school and the -- and making sure he gets what he needs.

Ms. Baker explained that Mother's missed visits were "either from her canceling [or] from her not confirming[,]" even though the Department had been clear that she needed to confirm her availability before each visit. Ms. Baker also noted that Mother did not attend "any doctor's visits, therapy visits, dental visits, IEP visits, [or] psychiatry visits" for the

20

Children.  In addition, she expressed concerns about the Children's safety in Mother's care, highlighting "the simple fact that she's not taking care of her mental health, and she hasn't been consistently taking care of her mental health in order to make sure that she provides a stable and safe household environment" for the Children.

Grandmother shared Ms. Baker's concern regarding Mother's visits, noting that they had been very inconsistent.  She emphasized that Mother often failed to confirm her visits as required, stating:

> Sometimes [Mother] wouldn't -- we have a link between me, [Mother], and the social worker, where [Mother] has to like text by a certain time [to confirm the visit]. And if she doesn't, then there's no visit for the day. Sometimes she would forget. Sometimes the boys would say, "Well, tell her don't forget to text for the visit." Sometimes she just would text and then have the visit.

When asked if she was open to allowing Mother to have unsupervised visits, Grandmother stated that although "that would take away one thing that I have to manage," she "just d[id]n't trust it yet."  She further opined, "if it was a little more consistent, I would be a little more comfortable with the visit."

Grandmother denied having seen "any proof" of Mother's autism, stating that she had "only been told by [Mother] that she had autism."  She also denied knowing "who [Dr. Newman] is."  Nonetheless, Grandmother acknowledged that Mother had memory and comprehension issues "all the time," such as "forgetting . . . detailed things that shouldn't have been forgotten or not able to do like normal things."  She also mentioned Mother's "selective memory" problem, explaining:

> [C]ertain things she'll say that happened did not happen. And that I have no recollection of it. Also, I checked with my other children to see if they

21

remembered any of it, and they did not remember any of that as well. She surmised that Mother's memory issue might have affected her ability to attend or schedule appointments relating to the Children.

Grandmother related that the Children were "doing really well" and "thriving" in her care. She stated that Z.F. was "getting much better in school" and "getting ready to take guitar lessons[,]" while B.F. had started piano lessons. They were also "getting big." Grandmother confirmed that she and her husband had been taking the Children to various appointments, including "therapy, the doctor, dentist, eyeglass, [and] the psych doctor."

When asked if the Children's reaction to Mother was positive, Grandmother initially replied, "I'll say yes," but then added, "If I have to say what my observation is, it is a little stressed, and a little uneasy." Specifically, she described an incident at a library "a couple weeks back," where "B.F. was doing something and [Mother] raised her voice and he jumped." Grandmother clarified that she did not think Mother was raising her voice to discipline B.F. Afterwards, B.F. "kept coming over" to Grandmother and "staying more closer [*sic*]" to her during the visit, while Mother and Z.F. continued playing. Still, Grandmother testified that the Children were missing Mother and had an overall "positive time" during visits.

Grandmother also testified about Mother's behavior during her May 26, 2024 visit. That day, a woman drove Grandmother and the Children to the visit, "just like . . . a Uber driver[.]" Later, as the woman was speaking to Grandmother in the parking lot, Mother suddenly "started yelling and cursing and went into . . . a rage." Following the incident, the Children "were upset[,]" with B.F. "wetting the bed for a period of time."

22

Mother did not deny her outburst during the visit but claimed that the woman first "verbally attacked" and "threatened" her. Mother testified that she "call[ed] 911 to make sure that nobody tried to say that [she] was out of control" and told Grandmother, "You can't stop me. You can't take my visit away from me." Mother stated that she is "just [ ] very vocal" and "loud[,]" but denied "screaming or waving [her] hands or anything like that" during the incident.

As for her inconsistent visits, Mother explained that the absence of any "signed service plan or visitation plan" resulted in "consistent back and forth via the emails." She agreed that the current visitation schedule was from 6 to 7 p.m. on Mondays, but claimed that, without a signed service plan, there were no "rules to abide by, essentially[.]" Mother also emphasized that she had been "compliant with everything . . . except for missing two visits[,]" one of which she attributed to a "business meeting" with her "patent attorneys." Regarding her failure to attend the Children's medical appointments, Mother stated that she had not had access to their medical information "over the course of the last year and a half" and, even after gaining the access, "sometimes these doctors' appointments are . . . rescheduled without [her] knowledge."

Mother testified that before May 2024, she had never received her autism diagnosis or "any helpful tips or recommendations" from Dr. Newman. Although she found the evaluation report "very helpful" for finding "proper therapeutic services" and "get[ting] the children back[,]" Mother claimed that she "got all the help on [her] own" with employment, housing, and mental health services, except for DORS and DDA. Mother stated that she recently found a job opportunity as "peer recovery specialist" through New

23

Life Recovery Center, explaining that it was "why [she] requested to find out whether or not the Department would be able to help [her] fund it."

During the hearing, letters from HOME and New Life Recovery Center were admitted into evidence without objection. The letter from HOME, dated September 18, 2024, stated that Mother had been "faithfully meeting with her therapist every Wednesday . . . since July 10, 2024" and scheduled for "weekly 45 minute to 1 hour telehealth therapy appointments." The letter from New Life Recovery Center, dated September 2024, related that Mother had been attending "psycho- educational group meetings as directed 4 times weekly[.]" The letter also stated that Mother "self-report[ed] a mental health diagnosis of ADHD" but was "not prescribed any medications to address the aforementioned concern" and she had been complaint "with all requirements for services."

### THE JUVENILE COURT'S RULING

On the last day of the final permanency review hearing, the juvenile court announced its ruling on the record.

*Reasonable Efforts*

The juvenile court found that the Department made reasonable efforts to achieve the permanency plan. Specifically, the court stated, "[w]ith respect to visitation . . . I find that, based on the evidence, [Mother] has not been consistent with the visitation. And I don't fault or find that the Department failed in its effort to reasonably accommodate that visitation." The court credited Grandmother's testimony and found that Mother "left the area . . . [for] around six months during this last review period." The court stated that Mother's absence from Maryland "may shed some insight onto why there were no visits,

24

perhaps only one visit, during the early part of this review period up until March of 2024." The court further found that "[i]n any event . . . the Department made extensive efforts to . . . arrange visits" when Mother was available, but "it seemed that [Mother's] work schedule or other commitments had a greater priority."

The juvenile court highlighted the Department's efforts to assist Mother with housing and employment, such as submitting DORS referrals and the DDA application. The court also found "[w]ith respect to employment verification, the Department attempted repeatedly to get information to verify . . . the employment that [Mother] identified." Similarly, "[w]ith respect to mental health records, the Department tried repeatedly, January, March, April . . . and May of 2024 to get these records from Dr. Newman[,]" but the records did not contain "any substantive treatment information." Still, "even though the Department was unable to get all the necessary records . . . the social worker referred [Mother] to Kennedy Krieger and Sheppard Pratt so that she could get providers who were experienced in providing mental health services to individuals with an autism diagnosis." The court further noted that Mother "was not cooperative" and "often . . . resist[ed] signing the consent forms."

The juvenile court pointed out Mother's "pattern . . . in many instances throughout th[e] review period." The court observed, "on the one hand, [Mother] is quick to point out her medical challenges, but yet she is able to, it seems, do certain things when she has a desire to do them." For example, according to the court, Mother was "able to do some work[,]" "able to travel[,]" and "able to e-mail and call the Department and identify what is working for her and what is not." The court did not find that "the lack of a new written . . .

25

service plan prevented Mother from understanding the services that the Department offered and the expectations that the Department had, including expectations regarding visitation."

*The Children's Best Interests*

Next, the juvenile court turned to consider the Children's best interests, as directed under CJP § 3-819.2(c), and determined that it was in their best interests to award custody and guardianship to Grandparents, grant supervised visitations to Mother, and terminate the CINA jurisdiction. The court explained:

> How are the [C]hildren doing? They're -- they should be the primary focus here. How are they doing? We've talked about the parents and the Department and its role. The boys are doing well in their current placement, where they've been since, as I noted, December of 2022.
>
> *   *   *
>
> I don't find that there's any current ability to be in a safe and healthy home with Mother. Mother has some untreated mental health issues that have been neglected. And she is just starting to get some form of treatment. But again, we don't have any substantive treatment information. We just have these letters [from HOME and New Life Recovery Center], and they are just from the most recent time.
>
> The [C]hildren's attachment and emotional ties to their parents and siblings. That's another factor under [FL § 5-525(f)(1)]. They seem to at times enjoy visiting with their Mother, and she has brought them books. But there have also been instances where they have been frightened. The Memorial Day weekend incident is one that comes to mind.
>
> [Grandmother] testified about that. [Mother] testified as well. I find that [Mother] became very loud. She began screaming and acting out. This frightened the children to the point where they stood behind their grandmother as if to shield themselves from her behavior. It was unprovoked behavior. And this is -- this was unhealthy.
>
> So the [C]hildren, I'm sure, have some feelings towards [their] Mother. But I don't find that they have significant attachment and emotional ties to her. With respect to the [C]hildren's emotional attachment to their current caregiver and caregiver givers [*sic*], family, their sister, [L.R.] who Mom was

26

found to have assaulted and for whom [Mother] is on probation for that assault, lives with them.

Their older sister is 15. So, the three siblings live together in . . . [G]randmother's home. They are well cared for. And the [C]hildren appear to have a close bond with both [G]randparents.

The length of time the child or children have resided with the current caregiver [--] They've been with the [G]randparents since December 19th of 2022. And that's been uninterrupted.

The potential emotional, developmental, and educational harm to the child if moved from the current placement. I find that there would be significant and substantial harm.

There has been progress as the [C]hildren have received services that they need; therapy, medication management, an IEP with respect to Z.F. They are bonded, as I said, with their [G]randparents and with their sister. And they have the stability that they need. They have the love that they need.

And so the Court finds that it would create great harm if there was a change in their current placement.

The potential harm to the child by remaining in State custody for an excessive period of time [--] It's often said, and it is true, that foster care is not a long-term plan. These [C]hildren have been in out-of-home placements, albeit with their . . . [G]randparents, for almost two years now, and they deserve permanency. And they can have that with the relief that Department has requested.

The court also noted that it took "all the factors into consideration[,]" including the testimony, court reports, and the home study report on Grandparents' home.

The court subsequently entered a written custody and guardianship order on September 26, 2024, which was amended on October 18, 2024. In the amended order, the court found:

[t]hat the following efforts were made to finalize the [C]hildren's permanency plan: Case management services provided; foster home

27

placement monitored/maintained; regular visits made;[23] appropriate referrals, services and assistance provided; treatment/service providers contacted; communication with both parents; visitations arranged; records reviewed; and meetings held/attended, and [t]hese efforts were . . . Reasonable[.]

The court also ordered, among other things, that: (1) the Children "be committed to the sole care and custody" of Grandparents; (2) Mother have weekly supervised visitations with the Children; and (3) "the existing [c]ommitment to the [Department] be rescinded," terminating the CINA cases. Mother timely noted this appeal.

## DISCUSSION

### *Standard of Review*

When a party appeals from a custody determination of the juvenile court in a CINA proceeding, we apply "three distinct but interrelated standards of review[.]" *In re M.*, 251 Md. App. 86, 110 (2021) (quoting *In re J.R.*, 246 Md. App. 707, 730-31 (2020)). *First*, when we review the court's findings of fact, "the clearly erroneous standard of Rule 8-131(c) applies." *In re Adoption/Guardianship of C.E.*, 464 Md. 26, 47 (2019) (citation and alterations omitted). "[A] juvenile court's factual finding 'is not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion.'" *In re I.Q.*, 264 Md. App. 265, 310 (2025) (quoting *In re M.H.*, 252 Md. App. 29, 45 (2021)).

*Second*, we review matters of law without deference to the juvenile court. *In re T.K.,* 480 Md. 122, 143 (2022) (quoting *In re Yve S.*, 373 Md. 551, 586 (2003)). If we find

---

[23] Although the juvenile court did not specify what the "regular visits" refer to, Mother claims, and the Department does not contest, that these visits mean the Department's visits to Grandmother's home.

error of law, "further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless." *In re C.E.*, 464 Md. at 47 (citation omitted). *Finally*, as long as the court's "ultimate conclusion" is "founded upon sound legal principles and based upon factual findings that are not clearly erroneous," we do not disturb that decision absent a clear abuse of discretion. *In re Adoption of Ta'Niya C.*, 417 Md. 90, 100 (2010) (citation omitted).

## I.

### REASONABLE EFFORTS

### *Parties' Contentions*

Mother contends that the juvenile court "erred" in finding that the Department made reasonable efforts towards her reunification with the Children. According to Mother, several findings that the court made with regard to the Department's efforts were "actual duties and not *services* designed to promote reunification[,]" and "the court's findings do not demonstrate how they worked to facilitate a permanency plan of reunification of the family." (Emphasis added). For example, Mother argues that the Department's visits with the Children at Grandmother's home were required under COMAR 07.02.11.17(A) and therefore do not qualify as "services."

Mother further contends that, when considering the Department's "services" provided to her, they fall short of the "reasonable efforts" requirement. Mother argues that, although she had requested the Department to "accommodate her disability, her autism diagnosis[ ] early on[,]" nothing in the court's findings demonstrated "accommodations for [her] autism or . . . specifically tailored services to accommodate this disability." Because

29

"the court can consider factors relevant to determining the best interest of the children" in custody and guardianship cases, Mother argues that the juvenile court should have considered the Department's failure to provide reasonable accommodations in finding reasonable efforts. Mother also emphasizes, citing *In re James G.*, 178 Md. App. 543 (2018), that it is incumbent upon the Department, not a parent, to provide services that "pertain to the impediments of reunification." *Id.* at 601. Thus, she argues, her failure to "communicate with the [D]epartment and engage in services . . . does not absolve the [D]epartment of its responsibilities to provide reasonable efforts or accommodations under the ADA."

The Department counters that the juvenile court found that it had made reasonable efforts for Mother's reunification with Children by "correctly rel[ying] on competent and material evidence[.]" The Department notes that Mother's counsel withdrew her exception to a reasonable efforts finding at the March 11, 2024 hearing, limiting the relevant review period to "[b]etween March and September 2024[.]" During this time, the Department emphasizes that it made extensive efforts "to encourage visitation, assess Mother's needs for services and her compliance with mental health treatment, and identify and recommend services to achieve reunification[.]"

Regarding Mother's ADA-related claim, the Department asserts that "Mother fails to point to any Maryland law requiring the court to make specific findings under the ADA when making a reasonable-efforts finding." The Department maintains that it did not violate the ADA, as the autism diagnosis from Dr. Newman "did not provide any insight into accommodations or treatment recommendations" and "Mother offer[ed] no details[,]"

30

while "rebuff[ing]" referrals to "well-respected providers . . . which could provide evaluation and treatment of autism[.]" The Department distinguishes *James G.*, where the father "never rejected any help" and "maintained his relationship with his children[,]" but received minimal assistance for reunification, from Mother's case, in which she demonstrated unwillingness "to receive [the Department's] help and . . . to be part of [the] [C]hildren's life."

### *Legal Framework*

The premise of Mother's argument is that the Department does not satisfy its *reasonable efforts* requirement if it fails to meet the ADA's *reasonable accommodations* requirement. Before addressing the merits of Mother's contention, we shall examine: (1) the definition of "reasonable efforts" under the CINA statute; (2) the definition of "reasonable accommodations" under the ADA; and (3) the relationship between "reasonable efforts" and "reasonable accommodations[,]" as interpreted by courts.

### *"Reasonable Efforts"*

The CINA statute defines "reasonable efforts" as "efforts that are reasonably likely to achieve the objectives set forth in [CJP] § 3-816.1(b)(1) and (2)." CJP § 3-801(x). Section 3-816.1(b)(1) requires that a reviewing court make a finding as to whether the local social services department "made reasonable efforts to prevent placement of the child into the local department's custody." For children who are placed in the Department's custody, CJP § 3-816.1(b)(2) specifies that in the review hearings, the juvenile court is required to make findings as to whether the Department made "reasonable efforts" to:

(i)     Finalize the permanency plan in effect for the child;
(ii)    Meet the needs of the child, including the child's health, education, safety, and preparation for independence[.]

CJP § 3-816.1 (b)(2)(i) and (ii).  The statute directs the court to "require a local department to provide evidence of its efforts before the court makes a finding required under this subsection[,]" CJP § 3-816.1(b)(4), and states that any such finding "shall assess the efforts made since the last adjudication of reasonable efforts and may not rely on findings from prior hearings."  CJP § 3-816.1(b)(5).  The statute further instructs that in making its findings in regard to the Department's reasonable efforts, the court "shall consider[,]" as relevant to the underlying case(s):

(1) The extent to which a local department has complied with the law, regulations, state or federal court orders, or a stipulated agreement accepted by the court regarding the provision of services to a child in an out-of-home placement;

(2) Whether a local department has ensured that:
(i) A caseworker is promptly assigned to and actively responsible for the case at all times;
(ii) The identity of the caseworker has been promptly communicated to the court and the parties; and
(iii) The caseworker is knowledgeable about the case and has received on a timely basis all pertinent files and other information after receiving the assignment from the local department;

(3) For a hearing under § 3-823 of this subtitle, whether a local department has provided appropriate services that facilitate the achievement of a permanency plan for the child, including consideration of in-State and out-of-state placement options;

(4) Whether the child's placement has been stable and in the least restrictive setting appropriate, available, and accessible for the child during the period since the most recent hearing held by the court;
                                        *    *    *

(7) Whether a local department has provided appropriate and timely services to help maintain the child in the child's existing placement, including all services and benefits available in accordance with State law, regulations, state and federal court orders, stipulated agreements, or professional standards regarding the provision of services to children in out-of-home placements.

CJP § 3-816.1(c)(1)-(4) and (7).

We observed in *In re Shirley B.*, 191 Md. App. 678 (2010), that based on the definition of "reasonable efforts" found in the CINA statute, "it is clear that there is no bright line rule to apply to the 'reasonable efforts' determination; each case must be decided based on its unique circumstances." 191 Md. App. at 710-11. We turned for guidance to the following passage from the Supreme Court of Maryland's decision in *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477 (2007):

> The court is required to consider the timeliness, nature, and extent of the services offered by DSS or other support agencies, the social service agreements between DSS and the parents, the extent to which both parties have fulfilled their obligations under those agreements, and whether additional services would be likely to bring about a sufficient and lasting parental adjustment that would allow the child to be returned to the parent. Implicit in that requirement is that a reasonable level of those services, designed to address both the root causes and the effect of the problem, must be offered—educational services, vocational training, assistance in finding suitable housing and employment, teaching basic parental and daily living skills, therapy to deal with illnesses, disorders, addictions, and other disabilities suffered by the parent or the child, counseling designed to restore or strengthen bonding between parent and child, as relevant. Indeed, the requirement is more than implicit. FL § 5-525[(e)], dealing with foster care and out-of-home placement, explicitly requires DSS to make "reasonable efforts" to "preserve and reunify families" and "to make it possible for a child to safely return to the child's home."

*In re Shirley B.*, 191 Md. App. at 711 (quoting *In re Rashawn H.*, 402 Md. at 500). We also observed that it is "clear . . . that there are limits on what the Department must do to

33

satisfy the 'reasonable efforts' requirement[.]" *Id.* The Department's efforts "need not be perfect to be reasonable, and it certainly need not expend futile efforts on plainly recalcitrant parents[.]" *Id.* at 712 (quoting *In re James G.*, 178 Md. App. at 601). Recognizing such limitations, the Supreme Court of Maryland has clarified that:

> The State is not obliged to find employment for the parent, to find and pay for permanent and suitable housing for the family, to bring the parent out of poverty, **or to cure or ameliorate any disability that prevents the parent from being able to care for the child. It must provide reasonable assistance in helping the parent to achieve those goals, but its duty to protect the health and safety of the children is not lessened and cannot be cast aside if the parent, despite that assistance, remains unable or unwilling to provide appropriate care.**

*In re Rashawn H.*, 402 Md. at 500-01 (emphasis added).

*ADA and "Reasonable Accommodations"*

Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall,[24] by reason of such disability, be excluded from participation in or be denied the benefit of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This mandate applies to "any department, agency, . . . or other instrumentality of a State or local government"— including a local social services department. 42 U.S.C. §§ 12131(1)(B). A public entity's

---

[24] For purposes of Title II, a "qualified individual with a disability" is:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2); *see also* 42 USC § 12102(1) (defining "disability" under the ADA).

failure to provide a reasonable accommodation may give rise to a claim under Title II. *See In re Chavis*, 486 Md. 247, 261 (2023).

Notably, "[i]t is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002), *superseded by statute on other grounds*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Rather, "the ADA makes clear that conclusions with respect to disability must be made on an individualized, fact-specific, case-by-case basis." *In re Chavis*, 486 Md. at 266. Likewise, "the question of '[w]hether an accommodation is reasonable depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the [ ] individual's circumstances and the potential accommodations.'" *Id.* (alterations in original) (quoting *Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 799 (9th Cir. 2017)).

In "[n]early every circuit court, including the Fourth Circuit," the party claiming an ADA violation bears the burden of "requesting, identifying, or proposing a reasonable accommodation." *Adkins v. Peninsula Reg'l Med. Ctr. (Adkins I)*, 224 Md. App. 115, 148 (2015) (quoting *Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 716 n.4 (D. Md. 2013)), *aff'd*, 448 Md. 197 (2016); *cf. In re S.Z.S.*, 524 P.3d 1209, 1214 (Colo. App. 2022) ("The [d]epartment can accommodate, and the juvenile court can address, only disabilities that are known to them." (alteration in original) (citation omitted)). Although a "formal request" or "magic phrase[ ]" is not needed, there must be "adequate notice" of the party's disability *and* need for an accommodation. *Adkins I*, 224 Md. App. at 140 (citation omitted); *see also J.W. v. Paley*, 81 F.4th 440, 450 (5th Cir. 2023) (explaining that "[n]otice

35

beyond merely notice of the disability is required" for failure-to-accommodate claim under Title II of the ADA) (citing *Windham v. Harris Cnty.*, 875 F.3d 229, 236 (5th Cir. 2017)). In assessing the adequacy of this notice, we determine whether the ADA claimant provided the opposing party "enough information . . . to know of both the disability and desire for an accommodation." *Peninsula Reg'l Med. Ctr. v. Adkins (Adkins II)*, 448 Md. 197, 216 (2016) (citation omitted).

<em>"Reasonable Accommodations" in CINA Proceedings</em>

We cannot find a Maryland appellate opinion in a CINA case that involves a claim against the Department under the ADA, so we look to those jurisdictions that have addressed ADA claims in cases involving their corollaries to Maryland's CINA statute. It appears that multiple states have recognized the general principle that their state and local social services departments are required under the ADA to make reasonable accommodations for parents with disabilities in rendering reunification efforts in child abuse and neglect cases. *See In re H.C.*, 187 A.3d 1254, 1265 (D.C. 2018) ("We take no issue with [the mother's] contention that Title II of the ADA . . . entitled her to reasonable accommodation of her intellectual and psychiatric disabilities in the provision of reunification services and the proceedings to determine the permanency goal for her child."); *accord In re S.K.*, 440 P.3d 1240, 1248 (Colo. App. 2019) (noting that "while Title II of the ADA is not a defense to termination of parental rights, it applies to the provision of assessments, treatment, and other services that the Department makes available to parents through a dependency and neglect proceeding before termination"); *In re K.L.N.*, 482 P.3d 650, 658 (Mont. 2021) ("We agree with numerous other courts the ADA requires

the Department to make reasonable accommodations for those individuals with disabilities in the reunification services and programs it provides."); *Jessica P. v. Dep't of Child Safety*, 484 P.3d 148, 152 (Ariz. Ct. App. 2021) (noting that the social services department "must provide a disabled parent in a [child neglect proceeding] with reunification services that comply with the ADA.").

Most jurisdictions that discuss the ADA's application in child abuse and neglect cases also find that a department of social services' obligation to make "reasonable accommodations" is consistent, if not synonymous, with the requirement to provide "reasonable efforts" under state law. *See In re A.P.*, 868 S.E. 2d 692, 698 (N.C. Ct. App. 2022) (stating that in permanency planning proceedings, "when a department of social services . . . satisfies th[e] [reasonable efforts] requirement, it complies with the ADA's mandate that individuals with disabilities be reasonably accommodated.") (citing *In re C.M.S*, 646 S.E.2d 592, 595 (N.C. Ct. App. 2007)); *In re H.C.*, 187 A.3d at 1265 ("We consider th[e] requirement of reasonable accommodation [under the ADA] to be entirely consistent with, and perhaps subsumed within, [the social services department's] general statutory obligation to expend reasonable efforts to make reunification possible."); *In re K.L.N.*, 482 P.3d at 658-59 ("We conclude . . . the ADA requirements to provide reasonable accommodations are consistent with—and generally subsumed within—the requirements [under Montana's child abuse and neglect statute] to provide reasonable efforts and to develop an appropriate treatment plan.").

Among those jurisdictions that view the obligation to make "reasonable accommodations" as commutable with the requirement to provide "reasonable efforts,"

some have declared that courts are not required to undertake an independent ADA analysis when determining whether a department properly addressed parents' disabilities. *See In re A.P.*, 868 S.E. 2d at 698 (holding that compliance with the state statute's requirement of reasonable efforts necessarily satisfies the ADA's mandate); *Lucy J. v. Dep't of Health & Soc. Servs.*, 244 P.3d 1099, 1116 (Alaska 2010) ("[T]he question whether reunification services reasonably accommodated a parent's disability is already included within the question whether active or reasonable efforts were made to reunite the family." (internal footnote omitted)); *see also In re K.L.N.*, 482 P.3d at 660 (holding that Montana courts "need not make specific findings under the ADA" to terminate parental rights because "meeting the [reasonable efforts] requirements of the state statutes necessarily requires the Department to have complied with the requirements of the ADA"); *cf. In re S.K.*, 440 P.3d 1240, 1249 (2019) (noting that the Colorado statute governing "reasonable efforts" specifically requires compliance with the ADA).

By contrast, the New York Court of Appeals has held that although the state's social services department "undoubtedly must comply with the ADA," the "reasonable efforts" requirement does *not* necessarily require the social services department to make "reasonable accommodations," and that a court "is not required to determine compliance with the ADA in the course of a permanency proceeding" because "[t]he ADA's 'reasonable accommodations' test is often a time- and fact-intensive process with multiple layers of inquiry" best conducted in "separate administrative or judicial proceedings, if required[.]" *Lacee L. v. Stephanie L.*, 114 N.E.3d 123, 129-30 (N.Y. 2018); *see also In re A.P.*, 728 A.2d 375, 379 (Pa. Super. Ct. 1999) (holding that inquiry into whether reasonable

38

accommodations have been provided is "untenable" in the context of a permanency proceeding, because "the trial court's focus is on the child's best interests" and the ADA "adds nothing to the trial court's fulfillment of its mandates[,]" including determination of whether reasonable efforts have been made to finalize permanency plan).

All the same, consistent with an ADA claimant's burden, states generally require parents who seek accommodations for their disabilities in child abuse and neglect cases to inform the department of their specific disability and identify what accommodations are necessary. For example, in *In re S.K*, the Colorado Court of Appeals instructed that "the parent is responsible for disclosing to the Department and the juvenile court information regarding his or her mental impairment or other disability. And the parent should also identify any modifications that he or she believes are necessary to accommodate the disability." 440 P.3d at 1248; *see also In re Hicks/Brown*, 893 N.W.2d 637, 640 (Mich. 2017) ("The Department, of course, cannot accommodate a disability of which it is unaware."); *In re D.R.*, 521 P.3d 545, 549 (Utah Ct. App. 2022) (holding that the ADA does not require the social services department and courts to explore or identify reasonable accommodations because "individual victims of an illness or disability may experience such a variety of symptoms that a mere diagnosis does not provide a sufficient basis for assessing the accommodations an individual with that diagnosis might need"). Thus, "before a public entity can be required under the ADA to provide reasonable accommodations, the entity must know that the individual is disabled, either because that disability is obvious or more likely because that individual, or someone else, has informed the entity of the disability." *In re S.K.*, 440 P.3d at 1248 (citing *In re Hicks/Brown*, 893

39

N.W.2d at 640); *In re Michael A.*, 81 N.Y.S.3d 146, 149-50 (N.Y. App. Div. 2018) (rejecting the mother's claim that the social services department failed to provide reasonable accommodations under the ADA where the mother failed to demonstrate that she was entitled to "services that were specifically tailored to individuals with cognitive limitations").

After examining the relevant Maryland and federal statutes and cases, and considering the various approaches employed in other jurisdictions, we hold that the Department is generally required under the ADA to make reasonable accommodations for parents with disabilities in rendering reunification efforts in CINA cases, as long as the parents make such disabilities, as well as the accommodations they require, known to the Department. The CINA statute instructs that in assessing the Department's reasonable efforts, the court "shall consider[,]" among other things, the extent to which the Department "has complied with the law, regulations, [or] state or federal court orders[.]" CJP § 3-816.1(c)(1); *see also* 42 U.S.C. § 12131(1) (providing that Title II of the ADA covers "any State or local government" and "any department, agency, . . . or other instrumentality of a State or . . . local government"). However, parents who seek accommodations for their disabilities in CINA cases must inform the Department of their specific disability and identify what accommodations are necessary. *See Adkins v. Peninsula Reg'l Med. Ctr. (Adkins I)*, 224 Md. App. 115, 148 (2015) (the party claiming an ADA violation bears the burden of "requesting, identifying, or proposing a reasonable accommodation") (citation omitted). We recognize that, depending on the circumstances, some parents may not be able to identify exactly what accommodations they require, but where, for example, the

40

Department arranges mental health services or rehabilitation services through which necessary accommodations can be identified, it is the parent's obligation to participate in those programs and provide the Department with all reports and assessments. Keeping in mind the broad purpose of the CINA statute, which "is to ensure that juvenile courts (and local departments of social services) exercise authority to protect and advance a child's best interests when court intervention is required," *In re T.K.*, 480 Md. 122, 147, (2022) (citation omitted), we emphasize that the parents remain obligated to comply with the court orders and service agreements. *See* CJP § 3-802(a)(4) (providing that one of the purposes of the CINA statute is to "hold parents of children found to be in need of assistance responsible for remedying the circumstances that required the court's intervention").

We also conclude that the question whether reunification services reasonably accommodated a parent's disability is already generally included within the question whether the Department met the CINA statute's "reasonable efforts" requirement. One of the purposes of the CINA statute is, "[e]xcept as otherwise provided by law, to hold the [Department] responsible for providing services to assist the parents with remedying the circumstances that required the court's intervention[.]" *See* CJP § 3-802(a)(5). Section 3-816.1(c) mandates that in making its "reasonable efforts" determination, a court must consider whether the Department "has provided appropriate services that facilitate the achievement of a permanency plan for the child[.]" CJP § 3-816.1(c)(3). As mentioned previously, reunification with the parent or guardian is given the foremost priority under Maryland law. *See* CJP § 3-823(e)(1)(i); *In re Blessen H.*, 392 Md. 684, 696 (2006); *In re Yve S.*, 373 Md. 551, 575 (2003). Also, FL § 5-525(d)(2)(i), which governs out-of-home

41

placement and foster care, expressly provides: "[a] child may not be committed to the custody or guardianship of [the] [D]epartment and placed in an out-of-home placement solely because the child's parent or guardian . . . has a disability[.]"  *See also* FL § 5-525(a)(2) ("'Disability' shall be construed in accordance with the ADA Amendments Act of 2008, P.L. 110-325.").

Often, a parent's disability is one of the contributing factors in a parent's inability to achieve reunification, and thus the Department is required to assist the parent with that disability. [25]  *See In re Shirley B.*, 191 Md. App. 678, 692-93 (2010) (finding that the Department made reasonable efforts, where the mother's "cognitive limitation" was the "primary barrier" for reunification and the Department referred her to DDA, DORS, and other services).  As the Supreme Court of Maryland has explained, the services that the Department is required to provide include "those services[ ] designed to address both the

---

[25] We observe that our published opinions routinely involve at least one parent with a "disability" as defined under the ADA, 42 U.S.C. § 12102, that the Department was required to address in its services plan.  *See, e.g.*, *In re Adoption/Guardianship of Jasmine D.*, 217 Md. App. 718, 727, 730 (2014) (stating that the mother's drinking problem was the "primary barrier" to reunification and that the Department fulfilled its obligations under the service agreement by providing referrals for doctors and treatment programs); *In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 706 (2011) (stating that the Department made referrals for the parent with history of substance abuse to "drug treatment programs, parenting classes, job skills classes, housing assistance, and supervised visitation assistance" (internal footnote omitted)); *In re Adoption/Guardianship of Darjal C.*, 191 Md. App. 505, 512 (2010) (providing that the Department followed the service plan by referring a parent with multiple mental health issues to a provider who offers "counseling, psychiatric evaluation, and therapy services"); *In re Alijah Q.*, 195 Md. App. 491, 495 (2010) (stating that the service plan required the Department to provide the parent with "referrals for various services," including in-patient substance abuse treatment and medication management); *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 481, 503 (2007) (noting that the mother was unable to comply with the Department's services to facilitate reunification "due to her disability and limitations").

root causes and the effect of the problem" such as "therapy to deal with illnesses, **disorders, addictions, and other disabilities suffered by the parent or the child**, [and] counseling designed to restore or strengthen bonding between parent and child[.]" *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 500 (emphasis added). Indeed, the Supreme Court has observed, "when attempting to comply with the Adoption and Safe Families Act of 1997, agencies and the courts[ ] must, at the least, recognize that Congress has also expressed a concern that extra steps be taken to [e]nsure that the disabled are not subject to discrimination, however inadvertent it may be in a given case." *In re Adoption/Guardianship Nos. J9610436 and J9711031*, 368 Md. 666, 675 (2002) (involving a parent with cognitive limitation).[26]

---

[26] Although *In re Adoption/Guardianship Nos. J9610436 and J9711031*, 368 Md. 666 (2002), involved a termination of parental rights ("TPR") proceeding, the Supreme Court of Maryland's reference to the Adoption and Safe Families Act of 1997 ("ASFA") applies to the "reasonable efforts" requirement in both the CINA and TPR contexts. In *In re James G.*, we explained the relationship between our CINA statute and the ASFA:

> Under Title IV–B and IV–E, as amended by ASFA, in order to receive federal funding, a state is required to implement a federally-approved state plan for the delivery of child welfare services, which, in relevant part, must provide that "reasonable efforts shall be made to preserve and reunify families . . . to make it possible for a child to safely return to the child's home," if such efforts are consistent with the permanency plan for the child. 42 U.S.C. § 671(a)(15)(B). However, ASFA also mandates that, "in determining reasonable efforts to be made with respect to a child . . . and in making such reasonable efforts, the child's health and safety shall be the paramount concern." *Id.*, § 671(a)(15)(A). Therefore, when continuation of reunification efforts is inconsistent with the permanency plan, the state plan must provide for completion of "whatever steps are necessary to finalize the permanent placement of the child. . . ." *Id.*, § 671(a)(15)(C).

178 Md. App. at 576-77 (alterations in original).

*Analysis*

We apply the foregoing precepts in our analysis of the record on appeal and conclude that the juvenile court was not clearly erroneous in finding that the Department fulfilled its obligations under CJP § 3-816.1(b) to make reasonable efforts to finalize the Children's concurrent permanency plans.[27] During the review period, the Department provided Mother with numerous services. The record shows that the Department: arranged visits with the Children; referred Mother to DORS and "a portal that DORS offers" for her housing assistance; arranged Mother's Zoom interview with DDA, submitted her DDA application, and provided her contact information to follow up; sent a new service plan to Mother for her signature; repeatedly attempted to obtain and verify her employment information; repeatedly attempted and ultimately obtained medical records relating to Mother's autism diagnosis; made "extensive efforts" to obtain Mother's mental health records and treatment information; and referred Mother to Kennedy Krieger and Sheppard Pratt to connect her with providers "who were experienced in providing mental health services to individuals with an autism diagnosis."

---

[27] We note that Mother claims in her brief on appeal that some of the "efforts" identified by the juvenile court were "duties" rather than "services" of the Department, and therefore, as we understand her brief, should not have been considered. However, Mother fails to specify which of the Department's efforts, besides home visits to the Children, she considers "duties" rather than "services." Regardless, the CINA statute does not support such a distinction. Rather, COMAR 07.02.11.03(B)(60) expressly defines "services provided to facilitate achievement of the child's permanency plan" to include "[s]upervision of the child's out-of-home placement to ensure the child's safety and well-being."

44

Mother does not specifically challenge any of these findings. Instead, as noted, Mother's primary argument is that these efforts did not reasonably accommodate her autism and thus violated the ADA. We disagree.

Although Mother's counsel told the court that Mother had autism early in the CINA proceedings, the Department tried for many months before it was able to obtain, in May 2024, the treatment note from Dr. Newman that included the diagnosis of autism. Mother also rejected most of the Department's health treatment service providers, and withheld verification of treatment from her own providers until May and July 2024—well over a year after the Children were placed in the Department's custody. As the juvenile court observed, Mother "was not cooperative" and "often . . . resist[ed] signing the consent forms."

Meanwhile, Mother made no effort to show how her autism imposed a substantial limitation on her engagement in services offered by the Department. The documentation received from Dr. Newman showed only his diagnosis of autism, but did not detail how that diagnosis was made or what accommodations Mother required. Mother does not refute Ms. Baker's testimony that Dr. Newman's autism diagnosis was not enough to "ensure the appropriate level of accommodations and intervention[.]"[28] Moreover, when

---

[28] It is established under the ADA jurisprudence that "[i]t is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002); *see also In re D.R.*, 521 P.3d 545, 549 (Utah Ct. App. 2022) ("[I]ndividual victims of an illness or disability may experience such a variety of symptoms that a mere diagnosis does not provide a sufficient basis for assessing the accommodations an individual with that diagnosis might need."). This is particularly true in the case of autism,

(Continued)

the Department recommended that she receive further evaluation at Kennedy Krieger Institute and Sheppard Pratt, Mother did not cooperate, leaving the extent of her disability and need for accommodation unclear throughout the CINA proceedings.

The record shows that Mother did not make any specific request for accommodations during the review period. *See Adkins v. Peninsula Reg'l Med. Ctr. (Adkins I)*, 224 Md. App. 115, 148 (2015) (explaining that under the ADA it is incumbent on the party seeking accommodation to request, identify or propose a reasonable accommodation). To the extent that Mother's counsel raised her potential eligibility for DORS at the December 1, 2023 hearing, Mother interjected and informed the court and her counsel that that she was already working, thereby obviating the need for a DORS referral at the time. Still, the Department later assisted Mother with DORS referrals and follow-

---

which involves "a wide array of diagnostic traits, behaviors, and challenges" and may "vary from person to person." *D.L. ex rel. A.L. v. Walt Disney Parks and Resorts US, Inc.*, 900 F.3d 1270, 1290 (11th Cir. 2018). As the Supreme Court of Maryland has recognized, "'autism,' itself, is not a single disorder but a '*set* of developmental disorders characterized by sustained impairments in social interaction [and] communication,' and . . . 'autism,' and 'autistic spectrum disorders' refer to a '*broad[ ] group* of pervasive developmental disorders.'" *Blackwell v. Wyeth*, 408 Md. 575, 630 (2009) (alterations in original) (quoting Institute of Medicine, *Immunization Safety Review: Vaccines and Autism*, Washington, D.C. (National Academies Press 2004)). Thus, the necessary accommodation for individuals with autism "at one end of the spectrum will differ dramatically from those . . . at the other end[.]" *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 394 (2017) (citation omitted). Indeed, federal courts have rejected failure-to-accommodate claims by plaintiffs who, even with the diagnosis of autism, failed to show any impediments. *See Preston v. Great Lakes Specialty Fin., Inc.*, 724 F.App'x 453, 456 (6th Cir. 2018); *Manson v. Md. State Bd. of Physicians*, No. 1:20-CV-03345-SAG, 2021 WL 2352285, at *4 (D. Md. June 9, 2021) (dismissing a complaint under Title II of the ADA where a plaintiff who had autism failed to demonstrate how his requested accommodation would have "facilitate[d] his equal access to [the defendant's] programs, services, or benefits").

ups. Likewise, in January 2024, when Mother's counsel requested referrals for mental health providers specializing in adults with autism, the Department—still not having received Dr. Newman's note at that time—directed Mother to multiple evaluation agencies. Mother, instead, determined she would reach out to the Autism Society, but there is no evidence in the record that she did.

Mother argues on appeal, as she did at the final permanency review hearing, that the absence of a second signed service (or visitation) plan demonstrates the Department's failure to reasonably accommodate her autism. However, we cannot locate where in the record Mother requested another service plan to accommodate her disability, and she does not provide citation to the record in her brief on appeal. Instead, the record indicates that the Department could not locate Mother—let alone discuss a service plan with her—until March 2024, and even then, she refused to sign another service plan.

Mother relies on *In re James G.*—a case that is factually dissimilar to this one—in support of her contention that the Department failed to provide reasonable efforts to facilitate reunification. In *In re James G.*, a department case worker testified that the father's main obstacles to reunification were lack of stable employment and housing, and the Department could not provide housing assistance until he had stable employment. 178 Md. App. at 550-53. Nonetheless, the Department only made "a single referral to one employment program" and did not assist the father further when he "call[ed] back and said that he did go [and] that they say they couldn't help him." *Id.* at 591-92 (alterations in original). On appeal, we concluded that the juvenile court was clearly erroneous in finding that the Department had made reasonable efforts. *Id.* at 548. To the contrary, here, the

47

Department offered numerous resources for housing, employment, and mental health treatment—many of which were frustrated or delayed by Mother's failure to follow through.

In sum, the record establishes that Mother failed to specify the extent of her disability or the accommodations she required, yet the Department made numerous efforts during the relevant review period—from December 2023 to September 2024—to assist with what it could, given what it knew about her disability. Accordingly, we hold that the juvenile court's finding of reasonable efforts towards Mother's reunification with the Children was not clearly erroneous.

## II.

### CHILDREN'S BEST INTERESTS

#### *Parties' Contentions*

Mother contends the juvenile court should not have closed the Children's CINA cases before giving her more time to achieve reunification because she "remained a fit parent and made progress with housing, mental health services, and visitation[.]" And, Mother asserts, "[w]here the evidence showed that [she] was making progress and that it was in the best interest of the children to be reunified with their mother, the court erred in granting custody and guardianship to the grandparents." Although Mother admits to missing multiple visits with the Children "due to her own requests or cancellations[,]" she claims that the court, in finding no bond or emotional attachment, focused on the "logistics of the visits and [her] inconsistencies."

Mother further argues that the court "ignored" her progress over time. Specifically,

Mother notes that during the period under review, she began "working with the [D]epartment to enter a job training program" in September 2024, "obtained stable housing with the New Life Recovery Center in July 2024[,]" and "receiv[ed] mental health treatment since at least July 2024[.]" As such, Mother claims that there would be "no prejudice to any party in waiting to see the results of six more months of therapy[.]"

In response, the Department maintains that Mother did not make "sufficient progress over the past 21 months[,]" and that the "concurrent permanency plans of reunification with Mother or custody and guardianship to the grandparents had been established at the March 2024 hearing." Quoting CJP § 3-823(h)(5), the Department argues that the juvenile court was required to review and assess the progress that had been made on the concurrent plans, "with the goal of being able to 'effectuate a permanent placement within 24 months after the date of the initial placement.'"

The Department emphasizes throughout the course of the CINA proceedings, it "unsuccessfully attempted to ensure that Mother received mental health treatment to enable the children to be safe in an unsupervised setting with her, but Mother has not remained for any length of time with one therapist, attended a recommended treatment provider, or supplied any proof to the court or Department of her prognosis or a treatment regime that would ensure the [C]hildren's safety." The Department points out that under FL § 9-101, Mother had the burden to prove to the court that there was no further likelihood of abuse of the Children, and that the court could not grant Mother custody until it could make the requisite FL § 9-101 findings.

The juvenile court did not abuse its discretion, the Department insists, by giving

49

little weight to Mother's claim that she had recently progressed with her mental health treatment and finding instead that she had neglected her untreated mental health issues. It avers that Mother "did not demonstrate progress but [rather,] a likelihood to switch providers." The Department refutes Mother's claim that the court improperly relied on Mother's inconsistent visits with the Children, and asserts that her failure to visit the Children from August 2023 to March 2024 "demonstrated her lack of commitment to the [C]hildren and their well-being."

### *Analysis*

The CINA statute requires that the juvenile court consider "[a]ll factors necessary to determine the best interests of the child" before granting custody and guardianship to a non-parent. CJP § 3-819.2(f)(1)(ii). We have long recognized that the best interests of the child is always "the overarching consideration" in custody and visitation determinations. *In re I.Q.*, 264 Md. App. 265, 316 (2025) (quoting *Baldwin v. Baynard*, 215 Md. App. 82, 108 (2013)).

We review a juvenile court's custody decision for abuse of discretion. *In re R.S.*, 470 Md. 380, 398 (2020). "[A]n abuse of discretion exists where no reasonable person would take the view adopted by the juvenile court, or when the court acts without reference to any guiding rules or principles." *In re M.*, 251 Md. App. 86, 111 (2021) (cleaned up). For the purpose of our review, we recognize that

> it is within the sound discretion of the [juvenile court] to award custody according to the exigencies of each case, and . . . [s]uch broad discretion is vested in the [juvenile court] because only [the judge] sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he is in a far better position than is an appellate court, which has only

50

> a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor.

*In re Yve S.*, 373 Md. 551, 585-86 (2003). To be sure, where, as here, a child is declared a CINA due to abuse or neglect, this discretion is bound by FL § 9-101(b), which requires that the juvenile court "specifically find[ ] that there is no likelihood of further child abuse or neglect" before granting custody or unsupervised visitation to the abusive or neglectful parent, "except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child." FL § 9-101(b); *see In re X.R.*, 254 Md. App. 608, 627 (2022). Otherwise, however, the juvenile court's decision "should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." *In re R.S.*, 470 Md. at 398 (quoting *In re Adoption of Cadence B.*, 417 Md. 146, 155 (2010)). Put differently, "we examine the juvenile court's decision to see whether its determination of the child's best interests was 'beyond the fringe' of what is 'minimally acceptable.'" *In re Ashley S.*, 431 Md. 678, 715 (2013) (quoting *In re Yve S.*, 373 Md. at 583-84).

Consistent with its statutory obligations, the juvenile court in the underlying permanency review hearing announced that the Children's best interests should be its "primary focus." The court found that the Children did not have any "ability to be safe and healthy" in Mother's home, citing Mother's "untreated mental health issues that have been neglected." *See* FL § 9-101 and FL § 5-525(f)(1)(i). The court next considered the Children's "attachment and emotional ties" to Mother and Grandparents, respectively, finding that they "have some feelings towards" Mother but did not have "significant

51

attachment and emotional ties to her[,]" and that they "appear to have a close bond with both [G]randparents." *See* FL §§ 5-525(f)(1)(ii)-(iii). The court also noted the length of time that the Children had been living with Grandparents—since December 2022—and found that "there would be significant and substantial harm" if they were removed from Grandparents' home. *See* FL §§ 5-525(f)(1)(iv)-(v). Finally, as to the "potential harm to the child by remaining in State custody for an excessive period of time[,]" the court noted that "foster care is not a long-term plan" and that the Children "deserve permanency." *See* FL § 5-525(f)(1)(vi). We conclude that the court made extensive findings reflecting careful consideration of "[a]ll factors necessary to determine the best interests of the child[,]" as required by CJP § 3-819.2(f)(1)(ii).

Mother challenges the juvenile court's finding that the Children lacked "significant attachment and emotional ties to her[,]" claiming that the court ignored Grandmother's testimony that the Children missed her. We disagree. Though acknowledging that the Children missed Mother and had "positive time" during visits, Grandmother also testified that they were "a little stressed, and a little uneasy[.]" She recounted an instance where Mother raised her voice at B.F. and startled the child, who "kept coming over" to Grandmother during that visit. Grandmother further testified that the Children were "upset" after Mother's outburst at the May 26, 2024 visit. In sum, under our deferential standard of review, there is sufficient evidence to support the court's factual findings. *See In re I.Q.*, 264 Md. App. at 310.

Mother also claims that the juvenile court ignored her progress over the last few months of the CINA proceedings—especially from July to September 2024—but the

52

record shows otherwise. The court expressly considered a "very recent" report that Mother had begun "some form of therapy, both with HOME and with New Life Recovery" but found that "substantive treatment information" was lacking. The court also noted that she continued to miss visits during the "most recent time period since July." As the CINA proceedings, which began in December 2022, neared the 24-month "benchmark" set by the General Assembly, *In re M.*, 251 Md. App. at 119, the record reveals that Mother's efforts remained largely inconsistent and deficient.

Furthermore, although the focus of the underlying review hearing was the period from December 2023 to September 2024, this does not mean that the court must completely disregard Mother's lack of progress in the past. "Reliance upon past behavior as a basis for ascertaining the parent's present and future actions directly serves the purpose of the CINA statute." *In re Adriana T.*, 208 Md. App. 545, 570 (2012) (citations omitted). This principle equally applies to "the *inaction* of a parent over time." *In re Priscilla B.*, 214 Md. App. 600, 625 (2013). "To the extent that inaction repeats itself, courts can appropriately view that pattern of omission as a predictor of future behavior, active or passive[.]" *Id.* Given Mother's missed visits and appointments, and her lack of communication regarding her employment, housing, and mental health treatment over nearly two years, awarding custody and guardianship to Grandparents—while allowing Mother to continue with supervised visitations—cannot be said to be "'beyond the fringe' of what is 'minimally acceptable.'" *In re Ashley S.*, 431 Md. at 715.

Finally, we disagree with Mother's claim that there would be "no prejudice to any party in waiting to see the results of six more months of therapy." Our law is clear: "a child

should have permanency in his or her life." *In re Jayden G.*, 433 Md. 50, 84 (2013). As the Supreme Court of Maryland emphasized, it is in the child's best interest "to spend as little time as possible" in the Department's custody before finding a "permanent home." *Id.* "Permanency for children means having 'constant, loving parents,' knowing 'that their homes will always be their home; that their brothers and sisters will always be near; and that their neighborhoods and schools are familiar places.'" *Id.* at 82-83 (citations omitted). "[I]t is this 'emotional commitment' and a sense of permanency that are absolutely necessary to ensure a child's healthy psychological and physical development." *Id.* at 84.

Overall, the record supports the juvenile court's finding that Mother failed to make sufficient progress toward reunification over the course of the CINA proceedings. The court found that Mother's "[u]ntreated mental health issues" made the home unsafe for the Children, and that she only received sporadic mental health services for much of the subsequent 21-month period. Mother was also uncooperative with the Department's efforts to monitor her progress. In the meantime, Grandparents—especially Grandmother—took care of the Children, addressed their medical and psychological needs, and provided them with a stable home. We hold that the juvenile court did not abuse its discretion in determining that it was in the Children's best interests to terminate the CINA proceedings and award custody and guardianship of the Children to their maternal Grandparents.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

54